I'm here today on behalf of Michael Owen who was sentenced to 250 months for his methamphetamine offense which was for attempting to manufacture a small amount of methamphetamine and associated firearms offense. The primary focus of this appeal is the methamphetamine portion of that sentence which was 130 months. That 130 months was primarily driven by a single guideline enhancement, the substantial risk enhancement. That enhancement increased Mr. Owen's offense level by 18 levels which corresponded to an increase of 106 months or almost 9 years. The district judge based this enhancement on its theory that they used up one pot so-called shake and bake meth lab that he had in his backpack created a substantial risk of harm to the life of a minor who was in the car with him when he was stopped by the police. In our briefs there was a significant amount of back and forth in a discussion about what exactly the term substantial risk signifies. It's Mr. Owen's position that that term must be something more than a small risk or some risk or a remote risk or a scant risk or even a possibility. And that's even taking into account the four factors that the commission directs judges to consider. So the factors aren't exhaustive, we all agree. And what I'm struggling with, I guess going both ways, is how you differentiate what is the threshold that creates a substantial risk. So the district judge Collier here thought that all the chemicals combined with being in a car in close proximity to a child created a substantial risk. Why isn't that sufficient? And if not, how do you draw the line? In other words, how do we come up with a clear line? Well, I would look to the case law that has already been published by this court. The first case I would look to is Davidson. Obviously Mr. Owen relies heavily on Davidson because in that case this court found that the risk was not sufficient. That case teaches us that the presence alone of the existence of a meth lab alone does not necessarily create some risk. It can't. Right. It must be something else. But what I struggle with with our case is, just to be candid with you, is they're kind of all over the map. So you've got a case, the government's got a few cases, we can go back and forth. What's the line? Like how do we know, when do you cross the threshold from risk to substantial risk? I think you can actually synthesize these cases by being able to, there is a line to be drawn. And if you notice, all of the cases that So what is it? Before you explain, what is it? The odor. The existence of an odor. At the time when the lab is encountered by police or when a search is conducted, there is an odor. That odor indicates that there has been in recent past a volatile reaction that creates a gas. There was no odor in this case. And this is even after the backpack was thrown on the ground, which is not that different from hitting a pothole. There was nothing in that sludge that was going to create the reaction to create the odor to create the danger. That's sort of a factual issue, isn't it? We're sort of bound, part of the premises of Judge Tappara's questions, I think, is that there's a factual record that we're sort of bound to honor absent kind of clear error. The only fact that's in the record is that there was sludge in the bottom of that bottle and there was a lid on the bottle. And the government's expert testified that in his experience he had not seen sludge that did not have lithium of some sort in it. The other fact that's in the record is that lithium reacts with water. It was not in a reactive state at the time that it was found, which means that there was no water coming in contact with lithium at the time that this lab was in the car with Mr. Owen and the miner. It wasn't happening. The only way that it could have happened, sorry. Right, but the district court judge found that all those elements were present and that given the existence of all those elements in the can, that it could combust. The only way the district court was able to connect the lithium that was presumed to be in that sludge, despite the fact that in the listed chemicals that the person who actually found the sludge did not list lithium, but setting that aside, assuming there was lithium in the sludge in some form, which was also not proven, it was there, it was unknown form, the only way that that could actually get to water was for it to float to the top of the sludge. There is actually no fact and no evidence in the record that this was possible for these elements, what was in essence a solid, to the top and then touch enough humidity. I'm sorry, what did you say? There's evidence in the record that what? That there's no lithium? No. The most evidence that was in the record was that the government expert assumed that there must be some leftover unreacted lithium in the sludge. Right. There's no leftover. There's no evidence about what form that lithium could possibly have been in or how it could have floated to the top of what is a solid, which is a sludge. If it could have done that, it would have done that when it landed on the ground when he threw the backpack down. Why? What makes you think that? Well, the only thing that the judge was able to imagine might happen to connect the lithium particles to the humidity. First of all, I haven't even gotten to the humidity, but the pothole. And given that the actual, that didn't happen, or we don't know that it happened, what did happen is he threw the backpack down. So there's been a jostling of this bottle, but there was no reaction happening at the time that the lid was taken off. There was no... These really strike me as factual issues, what the existence of the drugs were and what was the likelihood of explosion. Those strike me as factual issues that the district court has resolved against your client by and large. And the other thing is, it doesn't have to actually happen. That's, I think, the second part of that. And what he says is, however, because of movement of the vehicle, there was the possibility that some of the lithium would come to the surface and come into contact with moisture. And I don't find that irrational. All he's saying is there's a possibility of it. And then he's saying the possibility of the pothole, which you've just referenced. And so it seems to me what we're struggling with is kind of where are you drawing the line in facts versus law? And it seems to me all of his findings are facts. And the sole legal question is what I think is the hard one, which is taken all those facts, does it equal substantial risk? So in Davidson, the judge also engaged in some speculation and assumptions and reached factual conclusions that were speculative. The judge said that it was fair to assume that the defendant in that case had not disposed properly. Well, why is it speculation to say there's a possibility? That's not speculation. That's just reality. A possibility that you hit a pothole is reality. Of course, it's real that you could. No, the possibility that some of the lithium would come to the surface. You're saying it didn't. That doesn't mean you're saying the risk has to be a certainty if you're saying it has to be at the surface. He's saying there's a possibility it did. And that possibility ultimately is what posed a substantial risk. Does that make sense? It does make sense. What I would say is that we're talking about the physical properties of chemicals that can actually be measured and proven by an expert. And in this case, the expert's examples of the kinds of things that were dangerous in cars, in fact, involved a volatile process. It was an ongoing shake reaction that was occurring in cars. Are you saying an inactive lab in a car can never pose a substantial risk? No. That's the line I'd like to draw. And the line there is an inactive lab in a car where there is the volatile, dangerous, poisonous gas present. Either we know that because an accident or because, as in the 11th Circuit case in Finch, the defendants were transporting Do you have a case for that proposition that the odor has to be present for it to be a substantial risk? I do not have a case, although all of the cases that are pointed to in our briefs can be organized in a way that draw that line. Each one involved an odor. There is not one case The odor, is that proving recency? That the drug manufacturing had happened recently, that's why there's an odor? And so this is a timing issue? I would say that that probably is the way that that's viewed. It either was happening at the time that the lab was apprehended or very soon before that. You're saying that the chemicals are more likely to explode the closer it is to the actual cooking or manufacturing, and so the longer it goes, the less likely? I'm just trying to understand what the odor The risk, I believe that the way that the analysis goes, and it's often not very detailed, but I think the idea is that this way we know that reactions have been taking place on these premises or in this space where there are children present, or likely to be present. And we don't have that here. We know this can, we know these materials were used to manufacture drugs. Yes, but based on the actual It didn't happen in the car, it happened somewhere else? Yes, and the judge actually specifically finds that the reaction was complete because it And the evidence is there was no odor Before they got in the car, but can I ask another question about the odor? I'm sorry. So would the converse be true, that whenever there's an odor there's a substantial risk? Because that seems like a risky line for defendants. Well it has been true. I would say that if I were reading the cases and I were deciding whether I was going to transport my meth lab and it says that there's an odor, I wouldn't transport my lab if it's still smelling like meth. That's imagining they know the law. Of course. But the reality is, correct me if I'm wrong, and this I remember from long ago, but at most of these labs where they're at home, so just once we draw this line, I just want to understand the ramifications, there usually is an odor, right? Even if it's not a recent cook, the odor permeates at some point. So isn't that, I don't want to say dangerous, but isn't that line going to pose a problem in future cases for defendants where almost always they're going to get hit with this if children are around? I would say that that has already been the case and that this is a different situation when we're in a car. That sort of changes the analysis here because we know that it was, well we don't know how long it was, but it could have been a very short period of time and he's transporting something that is not in an active state. But Judge Collier thought the car added to risk versus cut again. That is true. Go ahead. He did, but the only way he could do that, if you read his analysis very carefully, and I'm sure you have, that the only way he's able to decide that the fact that he was in the car is what created the risk that was different was to have it hit a pothole and to have this lithium. Well, it's also the proximity to the child. Yeah, he says because of the movement of the vehicle, there was a chance, and then he says there was also a possibility of the car hitting the pothole or juggled the bottle in some way. And he also talks about in here somewhere, what Judge Radler just referenced, which is the closeness of the occupants. Well, I still believe that the answer to that question has to be that we do know that even if we're talking about movement of the vehicle, that that backpack was thrown to the ground and so that there was movement of that lab in the same way. Actuality instead of possibility, and we're just dealing with whether there's a risk, not whether it actually occurred. Then I would turn to Davidson again, and I would point out that it, that... I'm glad you really like that. One of the, one of... I don't like this well, so let me ask you a question about it. So I mean, in my mind, there's two things going on here. There's one, what's the likelihood there's an explosion? And two, if there is an accident, and if there is, what's the likelihood that a child was hurt? And the problem with this case is that the lab was right next to the child in a car. If anything went wrong with that lab, that child dies. I don't know if you'll concede that, but that would be my assessment. In Davidson, wasn't the lab locked away in a barn somewhere? And what was the risk of, what was the risk to children from the placement of the drug devices in Davidson? Well, it wasn't, it wasn't about children in that case. It was just people, harm to people. So, but what the judge said was that the existence of the padlock created a higher possibility of risk because it could lock someone in or lock someone out in the case of an explosion. And this court said that that kind of speculation was inappropriate because there was no evidence that that had actually happened. That's where I was going. Well, a padlock in a barn that, wasn't it a barn that was not in a real possibly area? Yeah, it was a lab located in a locked barn loft in a remote location is relatively speaking one of the least hazardous possible types of illegal meth manufacturing operations. We agree. So that was the defendant's argument and we agree. Your time is up, Ms. Coffin, if you want to finish the answer to that question. That question? Yes. Can I answer? Yes, absolutely. Yes. I would say that in the context of a one pot lab in a vehicle, Mr. Owen's lab presented the least, the least amount of safety hazard as any that you've seen in any of the cases because there was no active volatile process going on and there was no odor. Before you sit down, I'm sorry. Can I make sure? Judge Merritt, do you have any questions? No, that's fine. Okay. Thank you very much. You may proceed. Thank you. May it please the court, my name is Brian Samuelson and I represent the United States. Here is the best evidence to support the substantial risk of harm enhancement. The court heard expert testimony that there was a distinct possibility that Owen's meth lab could create a fire. The expert said that there was almost certainly unreacted lithium, there was water and there was lighter fluid in the bottle and then at the point it was found, there was a distinct possibility that it could create a fire. Can I ask about that? Because you all, I agree that that occurred. You all used the word, as does the district court, explosion, that there was a risk of explosion. There was just a risk of fire, right? Not explosion. Or was there actually a risk of explosion and who testified that there was a risk of explosion? I think it is probably better characterized as a risk of fire. This pot is next to other flammable and hazardous chemicals. I think the inference the court was making there was if there was a fire next to lighter fluid and drain cleaner and other dangerous chemicals that are open and unsafe, you know, what is a fire could be? The risk is coming from the fire. That's correct. And so let's assume there's this possibility and there's a risk of fire. So that means there's a risk to the miner. Where do you draw the line? Like what makes it substantial? Like okay, I get that there's a risk. But why is it a substantial risk? I think a few factors amount to a substantial risk. One is that it's not just a remote possibility of fire. The expert said there's a distinct possibility of fire from this lab. Do you have any cases for similar facts where there was a fire? Or did the expert testify to specific instances the expert was aware of where there was a fire? Because I don't recall that either. Uh, so the closest fact I think we have in the record to what you're asking about is the expert says the normal way to neutralize these types of labs so they don't blow up on their own is to take them out and do a controlled burn. So that certainly indicates that there is a risk. Can I ask one more question about that? Because I thought the officer unscrewed the cap. Yes. So that's not a controlled burn, right? Wouldn't that expose it to the air and thus produce the very risk we're all worried about? Well, of course, with this meth lab there are several different risks or risks coming from several different directions. So Officer Wilkie, when he arrives at the scene, he separates the lab from the other chemicals in case a flash occurs. He removes the cap because one danger is that pressures might be building up in this lab. And then a separate meth task force arrives to neutralize and take the lab away to be hazmatted. Now, it's true that we don't know exactly what that process entailed. We don't know if that involved a controlled burn. We know it involved at least a pH test. But there was some action taken to take this lab away and deal with it and dispose of it. What do you make of the fact that the point your friend on the other side makes that the combust or explode or catch on fire? Well, of course, this court has held that actual harm does not have to occur to warrant the enhancement. So the fact that nothing did happen is not a reason that the enhancement doesn't apply. It just says that whatever risk there was did not actually come to pass in this situation. So how would you draw the line? How do we draw a clear line as to what's the difference between a risk of harm and a substantial risk? I think the exercise is probably too fact specific to have a clear, bright line. On the one hand, we have cases like Davidson where the lab was locked in a remote barn loft far from people or other houses. On the other hand, we have on the other side of the line, we have cases like Merrill where there wasn't an ongoing reaction. It was just exposing kids to dangerous chemicals. And this case falls on that side of the line. It looks very similar to cases like Finch and Thorne and Pinkerton where dangerous chemicals in a car. Weren't those active labs, though? No, Your Honor. In, for example, Finch and Thorne, there was a thermos full of a chemical used in the manufacture of methamphetamine, but there was no reaction that would produce methamphetamine going out. I mean, do you agree with your friend that there was an odor in those cases? No, Your Honor. In those cases, there is no indication in those cases that there was an odor. And the expert in this case said, you know, a lack of odor doesn't mean this lab is safe. In some cases, like Whitehead, where the defendant was found in a motel room with a minor and a meth lab and finished methamphetamine, the court looked to the odor to say, okay, that's evidence that the meth lab was doing something dangerous while the child was in the room. But here we have other evidence of that. We have an expert that says at the point that this was found, the methamphetamine lab has all these dangerous chemicals mixed in such a way that presents an actual danger. So I don't think the odor is dispositive, nor have these cases required in order to apply the enhancement. I had sort of looked at it as a two-part test. One, what's the likelihood of explosion, fire? And then two, if that happens, what's the likelihood of injuring someone? And I thought on the likelihood of injuring someone, a child here, the scale was pretty high, and it's sort of medium to low maybe on the other factor. Are those the two factors we should be looking at? Is there something else that should be in the mix? No, I think that's right, Your Honor. And certainly the court looks at the fact that any fire in a moving vehicle, especially a fire next to other dangerous chemicals, would be very, very dangerous for any occupant, particularly a child in this car. So I do think, you know, it's not just how many chemicals there are, but also how dangerous they are. And the fact that there are a small amount of chemicals needs to be considered in the context that if there was a fire, if there was something went wrong, it would result in danger to this child. Do you describe... This is Judge Merritt in Nashville. If I ask this question, where it is in serious doubt as to the degree of risk, that is, maybe there was some risk, maybe there wasn't much risk, why should that end up redounding to the benefit of the government rather than the accused? Yes, Your Honor. And I don't think it does necessarily favor one party or the other. I think that's a factual issue that the district court needs to make a factual finding on in the first instance. Here the district court heard the testimony of the expert. He heard that there was distinct possibility of a fire. He learned about, you know, the nature of these chemicals and how they were mixed. And he made a factual finding that there was a possibility of fire. And that would be very dangerous in a car. So I think it's a factual matter that the district court has discretion to make findings on. And no matter how much doubt there is about it, the government wins. No, Your Honor. I don't think that's quite true. Of course, this court reviews factual findings for clear error. And it would be clear error if there were not sufficient evidence to support a finding that this could result in a fire. That would be clear error. That's not the case here, given the expert's testimony and what we know about these kind of labs and the inherent dangers of meth-making chemicals. Do you agree that we view the car with the can as the lab? In other words, a lab is oftentimes a physical space in a building. Yes, Your Honor. It's certainly this enhancement takes the context into account. And it takes into account that the fact that there was this particular lab in a car and that's the environment where this danger was present. Yes. And we know that this is the type of danger that Congress was worried about when it enacted this enhancement. It said that it was worried because even small amounts of chemicals pose serious dangers when manufacturing methamphetamine. And that's exactly the situation we have here. Admittedly, small amounts of chemicals posing serious dangers to a minor in proximity. So what would be a situation where there was a risk but not a substantial risk? Well, of course, the example we have is Davidson, that any meth lab poses inherent risks to people that might be about. But that lab was locked away. It was remote. It was not next to any people or buildings. But then isn't the test just whether the meth lab is close to people or children? And if it is, we imply the enhancement. And if not, we don't. I mean, that's a proximity point. And I take your point. And it's a valid one. But it seems to me the end result of that, absent something else being at work, is anytime it's close, it's a substantial risk. And anytime it's far or locked away, it's just a risk. Yes, Your Honor. I can't imagine exceptions to that general rule. I do think it is probably a general rule because meth labs are inherently dangerous. And bringing those in proximity with a person is dangerous. If, for example, the lab was in a professional environment and had industrial safety equipment and safety showers and protective clothing and hoods and whatever, maybe that is not a substantial risk to somebody in that lab. Or if the defendant was merely picking out chemicals with the intention of making meth later from Walmart and brought his kid along, maybe that doesn't pose a substantial risk, just placing those chemicals in a shopping cart because nothing's been mixed, nothing's been opened. So despite proximity, that may not qualify. But certainly in the mine run of cases, making meth next to a child will endanger that child. I'd like to turn to the reasonableness of the sentence, which was not only a within-guidelines sentence, but a bottom-of-the-guidelines sentence. And the important thing here is that the district court did, in fact, consider Owen's mental illness when it imposed the sentence. It credited Owen's argument that he has a mental illness, it explained that it couldn't determine what that mental illness was or what that diagnosis was, and then it weighed it against other relevant factors, including the severity of the offense, which it said was very, very serious, the need for deterrence, and the need to protect the public, given his long history of criminal history. So the court has accepted the defendant's mental illness, it's discussed the limitations of that finding, and it's weighed that factor against other factors, and that's a proper exercise of discretion. That's the court weighing and accepting and acknowledging this argument, and that's a proper exercise of discretion. So the bottom line with his sentence is that Owen was convicted of a drug offense in which he endangered the life of a child, and he was convicted of a firearms offense in which he shot at a police officer. In that context, the bottom of the guideline sentence is not unreasonable, and I urge this court to affirm. Thank you, counsel. If I may, I'd just like to go through the cases and the factors that did take it over the line from a risk to a substantial risk. In Lane, the neighbors smelled fumes. In Whited, the officers smelled a chemical odor, which is what took it over the line there from just proximity. In Paradis, or Paradis, how you pronounce it, the officers smelled pungent fumes, strong toxic fumes. In Finch, the car case that the government relies heavily on, there wasn't a fume. I will concede that it is not always a fume, but in that case, it was a poisonous gas being transported in an unapproved container through which it could corrode and actually be poisonous to the child because it was not being carried in the proper manner. It was a thermos, I believe, and that was a highly poisonous gas that was being carried in the car willy-nilly. In Pinkerton, we actually don't know what materials were in the car, whether there was a fume or a gas or anything being transported. So I would say that even though in those cases there is something more in the form of fumes or a poisonous gas. Fume evidence of the likelihood of another explosion or evidence that manufacturing had occurred previously? It's evidence that there has very recently been an ongoing active volatile process that could cause a fire. And Mr. Sorry, it's a little bit the latter, isn't it? That there was, it's evidence there was manufacturing. In the presence of the other people or a minor, yes. I would say that that's what it's viewed at. Mr. Owen is not saying you have to draw the line at these things. What he's suggesting is that whatever the line is, it does not encompass what he did in this case when there is no evidence of any active process at the time that the lab was in the car or even around any children, I guess I would say. There's just nothing like that here. And this, it's not, it's, you could do this on the facts given that in other cases, there's been some kind of line to be drawn. As Judge Sephard notes, it has to be something more than some risk. I would say even if we accept all of the facts and even if we accept that there was a possibility of fire if this lithium touched humidity, which Mr. Owen questions, even though lithium does darken in humid air and there might be a possibility of combustion under very certain circumstances, nothing like that was present here. And so his position. Time's up, but you can wrap up unless, Judge Merritt, do you have any questions? Yes, I do have one question. So let me ask you as a practical matter, this defendant has been in prison now for how many years? I would, I would say approximately seven years. And his mental condition and what, is anything, is there anything that indicate what would happen if he were released from prison? I mean, he would be homeless, wouldn't he? Well, Mr. Owen asked for a sentence of 15 years. So whatever, what he asked for, would keep him in prison for another seven years. The determination of how long to send someone to prison should not be based on someone's mental illness and whether they can be homeless or not. If at the end of those 15 years, the government decides that he's a danger, as a practical matter, that he would be homeless and on the street if he were out, I mean, that's not normally something we consider. But in this case, it looks like he's better off in prison than he is on the street as a homeless person. Well, he does have a mother who is willing to take him in and has taken him in in the past. And should it come to pass that at the end of his time in prison, 15 years, the government decides that he's a danger and can't function, then they can move to civilly commit him. That's the way we do this. We don't keep him in prison because he's mentally ill. So with that, I would just ask this court to vacate the sentence and remand for resentencing. Thank you very much. And thank you both for your very thoughtful arguments in this case. We'll take the case under advisement. You may call the next case.